In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-1523

STEPHEN RADENTZ, *et al.*,

*Plaintiffs-Appellants,*

*v.*

MARION COUNTY, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:07-cv-01161-WTL-DML—**William T. Lawrence**, *Judge.*

ARGUED SEPTEMBER 20, 2010—DECIDED APRIL 5, 2011

Before EASTERBROOK, *Chief Judge*, and POSNER and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge*. The plaintiffs-appellants Stephen Radentz, Michele Catellier, and Forensic Pathology Associates of Indiana, brought an action under 42 U.S.C. § 1983 alleging that the defendants violated their rights under the Equal Protection Clause of the Fourteenth Amendment. The suit was brought against Marion County, as well as against Kenneth Ackles individually and in his official capacity as Marion County

Coroner, and Alfarena Ballew, individually and in her official capacity as Chief Deputy Coroner. The suit alleged that the defendants' decision to terminate the plaintiffs' contract of employment was based on race discrimination, and specifically was part of a broader effort to replace white workers with African-American workers. The district court granted the defendants' motion for summary judgment against Radentz and Catellier, and the plaintiffs now appeal that determination.

We consider the facts as set forth by the district court, in the light most favorable to the plaintiffs, the non-moving party. *Casna v. City of Loves Park*, 574 F.3d 420, 424 (7th Cir. 2009). In November 2004, Dr. Kenneth Ackles, an African-American chiropractor, was elected Marion County Coroner. At that time, the Marion County Coroner's Office (the "Coroner's Office") had a contract with Indiana University, whereby the University provided the Coroner's Office with physicians and support staff who performed forensic pathology services and autopsies. The contract was a financial boon to the Coroner's Office, because it essentially subsidized Marion County in the amount of several hundred thousand dollars each year. That contract expired on December 31, 2004, the day before Ackles took office, but Indiana University continued to provide forensic pathology services despite the expiration of the contract. Ackles' Chief Deputy Coroner, John Linehan, learned in April 2005, that Indiana University had not been paid for its services since January 2005. Indiana University eventually terminated its contract with the Coroner's Office, providing 60 days' notice of that termination in July 2005.

That decision sparked the search for a replacement. In order to ensure the continuity of autopsy services in the Coroner's Office, Linehan contacted Dr. Radentz and Dr. Catellier, who were both board-certified forensic pathologists employed by Indiana University and who had been performing autopsy services for the Coroner's Office under its contract with the University. Radentz and Catellier formed a limited liability company, Forensic Pathology Associates of Indiana ("Forensic Pathology"), and the parties negotiated a contract designed to replicate closely the Indiana University contract. They entered into a five-year contract in September 2005 under which Forensic Pathology would provide forensic pathology services to the Coroner's Office and would perform autopsies upon request. The contract also allowed Forensic Pathology to provide outside autopsies for other counties, and required the Coroner's Office to furnish all of the supplies for such autopsies. According to the plaintiffs, because Forensic Pathology was allowed to make additional money by performing outside autopsies, it was able to charge the Coroner's Office a lower price for Marion County's own autopsies. The contract provided that it could be terminated by either party without cause on six months' notice. It further provided that upon six months' notice, the Coroner's Office could cause Forensic Pathology to cease performing outside autopsies. It is undisputed that the contract between Forensic Pathology and the Coroner's Office was more costly for Marion County than the one with Indiana University, in which the University effectively subsidized some of the costs.

In November 2005, Ackles terminated Linehan, ultimately replacing him with Alfarena Ballew, an African-American woman. Linehan subsequently filed a complaint of reverse race discrimination against the Coroner's Office, which was successful. *See Marion County Coroner's Office v. EEOC*, 612 F.3d 924 (7th Cir. 2010).

Almost immediately, Ballew took charge of most of the day-to-day decisions at the Coroner's Office, with only minimal input or oversight by Ackles. Ballew began expressing concern about the costs of the contract with Forensic Pathology. The defendants devote much of their briefs in this appeal to detailing each conversation, letter, or notation indicating Ballew's dissatisfaction with the costs of the contract, and more specifically her concerns over the costs of providing the supplies for the outside autopsies. We will not repeat those facts here, because we can assume that Ballew was legitimately concerned that the costs of the supplies for outside autopsies were excessive. The Coroner's Office ultimately terminated the contract with Forensic Pathology under the contract provision that allows termination without cause upon six months' notice. Although no reason for the termination was given at the time, the defendants assert that the termination was based on the legitimate, nondiscriminatory reason of budgetary concerns regarding Forensic Pathology's use of the Coroner's Office supplies to perform out-of-county autopsies. The plaintiffs, however, maintain that the termination of the contract was actually based on the defendants' desire to replace them with African-Americans.

In order to succeed on their claim, the plaintiffs first must demonstrate by a preponderance of the evidence that they were the victims of intentional discrimination when the defendants terminated the Forensic Pathology contract. They may do so through direct proof of discriminatory intent or they may prove such intent through the indirect method outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Williams v. Seniff*, 342 F.3d 774, 788 n. 13 (7th Cir. 2003) ("Our cases make clear that the same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection."). The district court held that the plaintiffs met their burden under the indirect method, and no one contests that determination on appeal. Under that approach, the plaintiffs must first establish by a preponderance of the evidence a prima facie case of discrimination, which then creates a presumption that the employer unlawfully discriminated against the plaintiffs. *Id.* at 788. Once that prima facie case is met, the burden shifts to the employer to produce evidence of a legitimate, nondiscriminatory reason for the action alleged to be discriminatory, in this case the termination of the contract. *Id.* If the employer satisfies that burden of production, the plaintiffs must establish by a preponderance of the evidence that the proffered reasons for the alleged discriminatory action are pretextual. *Id.*

The district court conflated the prima facie and pretext inquiries, noting that under the indirect method, the prima facie and pretext analyses often overlap and that courts can proceed directly to the pretext inquiry if the defendants offers a nondiscriminatory reason for

their action. *Adelman-Reyes v. Saint Xavier University*, 500 F.3d 662, 665 (7th Cir. 2007). The parties likewise focus solely on whether the plaintiffs have established a genuine issue of fact as to whether the nondiscriminatory reason provided by the defendants was pretextual.

The defendants contend that the contract was terminated because it was too costly, and specifically that the cost of providing supplies for the out-of-county autopsies was prohibitively expensive. The defendants specifically deny any concerns with the quality of the plaintiffs' work. In fact, in a letter three months after the termination notice was given, Ackles indicated a desire to retain the plaintiffs, noting that their work was valuable and essential to the office. Ballew similarly indicated that she had no problems with the quality of their work, and maintained that she was interested in retaining them.

In order to demonstrate that the reason for the termination was pretextual, the plaintiffs must demonstrate that the nondiscriminatory reason was dishonest and that the defendants' true reason was based on discriminatory intent. An employer's justification may be considered pretextual where the plaintiff demonstrates that it had no basis in fact, it did not actually motivate the decision to terminate employment, or it was insufficient to motivate that decision. *Davis v. Wisconsin Dept. of Corrections*, 445 F.3d 971, 977 (7th Cir. 2006); *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004). The focus for the court is not whether the defendants' decision was a wise one, but whether it was

honestly believed. "If a reasonable factfinder would be compelled to believe [the defendants'] explanation, then the [defendants are] entitled to summary judgment." *Argyropoulos v. City of Alton,* 539 F.3d 724, 736 (7th Cir. 2008); *Culver v. Gorman & Co.,* 416 F.3d 540, 547-48 (7th Cir. 2005). A review of the evidence reveals that a reasonable factfinder would not be compelled to believe that the contract was terminated because it was too expensive, and therefore the district court improperly granted summary judgment.

The sole justification for the termination was that the use of Marion County supplies for out-of-county autopsies rendered the contract too expensive. As was noted, there is ample evidence in the record that Ballew was concerned about the cost of the contract because of the extra-county autopsies. Although the plaintiffs dispute whether Ballew honestly believed the costs were excessive, or whether she used that as a hook to disturb the contract, we can assume for this opinion that the defendants were indeed concerned with the expense of the supplies under the contract. The question remains whether the termination of the contract was based on those concerns.

The contract provision with which Ballew took issue was provision K, which in conjunction with provision B.4 allowed the plaintiffs to use Marion County facilities and supplies to conduct out-of-county autopsies, for which the county received no payment. Provision B.4 provided that the Coroner's Office was responsible for "furnishing any and all supplies and other materials

necessary to provide the services described in this Agreement." The authority to perform out-of-county autopsies authority was set forth in provision K of the contract, which provides in its entirety:

Contractor's Use of Facility

The Coroner acknowledges and consents to the Contractor performing the same or similar services for political subdivisions within Indiana in the Coroner's facility. The Coroner may, in its sole discretion and without cause, request that the Contractor cease performing such services upon six (6) months' written notice to the Contractor.

Those provisions indeed authorize the use of County facilities for out-of-county autopsies. Provision K also, however, provides for the termination of that authority upon six months' notice. Although the plaintiffs note in their opening brief that the defendants had that ability to end the extra-county autopsies, the defendants do not explain why that option was not exercised. At oral argument, counsel for the defendants asserted that they did not exercise that option because they feared that if they were to do so, the plaintiffs would find the contract too unprofitable and would exercise their option to terminate the contract. Essentially, the defendants are asserting that they terminated the contract because if they just modified it the plaintiffs might terminate it. That is nonsensical.

In their briefs to this court, the defendants appear to believe that it is not our province to inquire as to why they chose to terminate rather than modify the con-

tract, and that we cannot examine the wisdom of their business decisions. They further argue that the plaintiffs brought a discrimination complaint based on the termination, not based on a failure to renegotiate the contract. We do not examine the wisdom of business decisions, but we do consider whether the asserted justification for the termination was honestly-held. That determination is relevant to the claim of discriminatory termination. Here, the defendants consistently have maintained that they were pleased with the quality of the plaintiffs' services, and that they wished to retain the services of the plaintiffs, but that they could not do so because the out-of-county autopsies rendered the contract too expensive. They failed, however, to utilize the contract provision that would have directly met both of those professed desires—it would have eliminated the extra expense while retaining the services of the plaintiffs. Nor could the requirement of six months' notice have been a factor in that choice, because in terminating the contract, the defendants relied on the provision for terminating without cause, and gave the six months' notice required by that provision. The failure to exercise the right under provision K to eliminate the troublesome expenses, and to instead terminate the contract, casts doubt on whether the expense was actually the reason for the termination.

Those doubts are magnified by other evidence in the record. Although the defendants expressed a desire to retain the services of the plaintiffs, there is evidence that, if believed, would indicate that they made no real efforts to negotiate a new contract or rehire the plain-

tiffs. Instead, they hired an African-American woman, Dr. Joye Carter, for the position of forensic pathologist, and there is evidence indicating that was their intent from the outset. When Ackles was first elected, he met with Linehan and discussed ways to hire more African-Americans and to replace white workers in the Coroner's Office. Linehan was concerned about the legality of such a suggestion and he consulted with the Office of Corporation Counsel which confirmed to Ackles that he could not fire white workers solely to install more African-American employees. In January 2005, Ackles expressed to Linehan his desire to hire an African-American pathologist, and specifically mentioned Dr. Joye Carter. That the defendants in fact hired Dr. Carter to replace the plaintiffs allows an inference that the termination of the contract was the culmination of a plan to replace the white Indiana University pathologists with an African-American.

The district court was dismissive of the relevance of those statements, noting that they occurred well before the Forensic Pathology contract was signed and characterizing them as mere stray comments unrelated to the decision to terminate Forensic Pathology. The timing of the comments is relevant, and the court properly noted that after indicating the desire to hire an African-American forensic pathologist in January 2005, Ackles nevertheless entered into a contract with the defendants who are white in September 2005. That does not render the race-based statements "stray comments," however, given the urgency surrounding the initial contract with Forensic Pathology. In April 2005, Indiana University

informed Linehan that it had not been paid for its services for some time, and in July 2005 the University sent a 60-day notice terminating its contract. Because the investigation and prosecution of crimes is dependent on autopsies and pathologist testimony, Ackles was faced with the need to find a replacement quickly to ensure a seamless transition. The hiring in September 2005 of the pathologists who had been working for Indiana University must be viewed in that context. Moreover, Linehan was the Chief Deputy Coroner at the time of the contract with Forensic Pathology. Ballew took over his position in December 2005. Within just nine months after Forensic Pathology began its five-year contract, and six months after Ballew became Chief Deputy Coroner, the defendants issued a notice terminating that contract. They then replaced the plaintiffs with an African-American, Dr. Carter. Given that sequence of events, the hiring of the white plaintiffs does not neutralize Ackles' earlier comments that he desired to replace white employees with African-Americans. *See Marion County Coroner's Office*, 612 F.3d at 930 n. 6 (in discrimination case brought by Linehan, a white male, court considered the defendant Ackles' stated preference for hiring African-Americans even though Ackles initially hired Linehan and another white employee, where Linehan was retained for the sake of continuity in the office and the white male who replaced him took over on an interim basis for only a few weeks until Ballew, an African-American, was hired). The need for a quick transition and the short duration of the Forensic Pathology contract allows for an inference that

their hiring was merely as a placeholder while the de-
fendants pursued the goal of hiring African-Americans.
Therefore, the court erred in dismissing outright any
consideration of the clear statement by Ackles that
he wanted to replace white workers with African-Ameri-
cans, and that he wanted to hire an African-American
pathologist. Those statements provide some support
for the plaintiffs' claim that their termination was race-
based.

Adding to the impact of that progression of events
is the manner in which the hiring decision was made.
There is evidence indicating that no national search
was undertaken to fill the position and Ballew acknowl-
edged that to her knowledge the position was not
even posted with the National Association of Medical
Examiners. Ballew indicated that Dr. Carter was the
only individual interviewed in person for the position
of Chief Forensic Pathologist. Evidence further indicates
that the Coroner's Office did not receive letters of recom-
mendation for Dr. Carter until after she was offered
the position. The sequence of events, and the manner
in which it occurred, further indicates that the decision
to terminate the contract rather than exercise the
provision K rights was race-based.

Other evidence lends further support to that conclu-
sion. The racial makeup of the office changed significantly
during Ackles' tenure. As a whole, the office went
from 16.67% African-Americans to 36%. That figure,
however, includes the large number of part-time em-
ployees, who according to plaintiffs work only sporadic

hours and receive no benefits. The racial change was even more dramatic when considering full-time employees. From the time of Ackles' election to the end of 2007, the Coroner's Office changed from 8 full-time white employees to 6, and the number of African-American employees transitioned from 2 full-time employees to 7, or 54% of the full-time workforce. All three full-time supervisory positions were held by African-Americans. The plaintiffs produced evidence that the change was not inadvertent, citing a statement made during the search for the replacement for the defendants. One of the receptionists heard Ackles discussing how to replace the doctors, in which he laughingly told Ballew "I will put my people where they belong." That statement was construed as again indicating a desire to place African-Americans in the positions.

Finally, the evidence indicated that the termination of the defendants' contract and the hiring of Dr. Carter did not result in any financial benefit. Moreover, in response to questioning at deposition, Ballew stated that she had conducted an analysis of forensic pathology services prior to terminating the Forensic Pathology contract, and that the analysis did not lead her to conclude that terminating Forensic Pathology's contract would save the county money. The district court again dismissed the evidence of the lack of financial savings based on the caution that we should not second-guess the defendants' legitimate business decisions. That is an important proviso, but the financials are nevertheless relevant to the question as to whether the cost of the contract was the true reason for its termination. The lack of monetary

savings—or even of an attempt to achieve monetary savings with Dr. Carter's contract—is relevant to the determination as to whether the need for cost savings was the driving force in the decision to terminate the contract.

Taken as a whole, we cannot conclude that a jury would have been compelled to believe the defendants' explanation. The plaintiffs have produced evidence casting doubt as to whether the decision was truly based on the allegedly exorbitant costs of the out-of-county autopsies. The ability to end those autopsies upon six months' notice under provision K of the contract, without terminating the contract itself, is a significant factor, particularly given the defendants' claims that they were pleased with the quality of the plaintiffs' work and wanted to retain them. The other evidence cited above further indicates that race, rather than cost concerns, were the true reason for the decision. The issue before us is whether summary judgment was proper. There is a factual dispute as to whether the decision to terminate the contract was based on a nondiscriminatory reason or whether it was race-based. Therefore, the decision of the district court is REVERSED and the case REMANDED for further proceedings consistent with this opinion.