In the

# United States Court of Appeals

### For the Seventh Circuit

No. 12-1954

PARVATI CORP.,

*Plaintiff-Appellant,*

*v.*

CITY OF OAK FOREST, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 C 702—**Amy J. St. Eve**, *Judge.*

ARGUED FEBRUARY 11, 2013—DECIDED MARCH 1, 2013

Before EASTERBROOK, *Chief Judge*, and POSNER and
TINDER, *Circuit Judges*.

POSNER, *Circuit Judge.* The City of Oak Forest, Illinois,
is a largely suburban community about a half hour's
drive from downtown Chicago. A company named
Parvati that owned a hotel in Oak Forest sued the City
and a number of its officials charging racial discrimina-
tion in zoning, in violation of 42 U.S.C. §§ 1981 and 1982,
and also charging that the City's zoning ordinance is

unconstitutionally vague. The company seeks damages caused by the City's refusal to allow it to sell the hotel for conversion to a retirement home likely to be occupied mainly or exclusively by black people. (It is unclear what relief it seeks for the vagueness of the ordinance.) The district court granted summary judgment in favor of the defendants on both charges.

Parvati had built the hotel, a 60-room Ramada Inn, in 2000 in an "M" (Limited Manufacturing) zoning district, a district in which "highway oriented commercial/retail uses" were permitted at the time. The hotel qualified as such a use because it was close to Interstate 57, a major highway that traverses Oak Forest.

But the hotel proved to be a flop commercially, and Parvati decided to try to sell it for use as a "senior independent living facility"—a retirement home or equivalent. Parvati's real estate listing agent met with some of the City's officials to discuss the idea of converting the hotel to such a use. The agent testified in his deposition that he had the "impression" that the officials favored the idea, though he didn't testify to what they actually said.

In 2004 Parvati signed a contract to sell the hotel to a company affiliated with the Bethlehem Missionary Temple Baptist Church of Harvey, Illinois, www.bethlehemtemplembchurch.org/ (visited Feb. 19, 2013), for use as a retirement home. The church's pastor and most (maybe all) of its members are black; and although membership in the church was not intended to

be a requirement of residence in the retirement home, doubtless most of the residents would be members of the church. The contract of sale was contingent, however, on Parvati's obtaining a zoning change, since a retirement home would not be "highway oriented." A representative of Parvati, accompanied by the pastor of the church, Reverend J. C. Smith, met with City officials to discuss the possibility of amending Oak Forest's zoning ordinance to authorize the changed use of Parvati's property. As a result of meeting Smith and learning about his church, the officials would have realized that the hotel, if converted to a retirement home, would house black people.

Two weeks after the meeting, the City's Community Development Department asked the City's zoning commission to recommend to the City Council that the M zoning classification be replaced by two new classifications—M-1 for light industrial uses and M-2 for heavy industrial uses. The Council amended the City's zoning ordinance accordingly. The amended ordinance does not authorize nonindustrial highway-oriented uses, or residential uses whether transient, permanent, or other, in either type of district. Parvati concedes that the amendment made its hotel a "nonconforming," that is, a forbidden, use, though its use as a "highway oriented" hotel was grandfathered. Reverend Smith sought a further amendment to the zoning ordinance, to permit the conversion of the hotel to a retirement home. The zoning commission recommended to the City Council that his application be denied, and it was.

Parvati persisted. It signed a contract to sell its hotel to a different company affiliated with Reverend Smith's church. The company applied to the City for a license to convert the hotel to an "extended stay hotel," a term that the parties agree includes a retirement home. The provision of "extended stay services," though it is a land use mentioned in the City's zoning ordinance, is not a use that is permitted in M-1 or M-2 districts, and it was not permitted in their predecessors, the M districts, either. The City Administrator rejected the application, pointing out that not only had the original ordinance, which permitted hotels as a "highway oriented" use, limited that permission to hotels providing temporary lodging, as distinct from "extended stay services," but even the original use of the hotel, as a highway oriented facility, was now, under the amended ordinance, a nonconforming use, and the City's zoning ordinance forbade replacing one nonconforming use with another nonconforming use. The City Administrator offered to assist the church in finding alternative sites in Oak Forest for its retirement home in zoning districts in which such a use was permissible. Reverend Smith did not take up the invitation.

Parvati's last hope was to obtain a "special use" permit for conversion of its hotel to a retirement home. The 2004 zoning amendment that had split the M districts into M-1 and M-2 districts had not spelled out what uses would be permitted in either type of district. Discovering the oversight in 2007, the City amended the ordinance to add a list of permitted uses—and the list included "extended stay hotels" as "special permitted uses" in both

types of M district. So Parvati applied for a special use permit, and again was turned down. This time the ground was that the inclusion of "extended stay hotels" in the list of specially permitted uses had been a scrivener's error.

Parvati later lost the hotel to foreclosure. Another corporation bought the hotel at the foreclosure sale and is continuing to operate it as a conventional "highway oriented" hotel, though under the Best Western rather than Ramada Inn trade name.

Parvati's owners are of Indian (Asian Indian, not American Indian) origin, and initially they claimed that that was why the City had discriminated against them by preventing their selling the hotel for use as a retirement home for members of Reverend Smith's church. They have abandoned this claim, and now argue only that the defendants discriminated against Reverend Smith, his flock, and the church's affiliated companies on grounds of race. But a company can complain about financial harm caused it by racial discrimination against potential customers. *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237 (1969); *New West, L.P. v. City of Joliet*, 491 F.3d 717, 720 (7th Cir. 2007); *Des Vergnes v. Seekonk Water District*, 601 F.2d 9, 13-14 (1st Cir. 1979). Smith's black church was a potential buyer of Parvati's hotel; that the church dealt with Parvati and the zoning authorities through corporate affiliates is of no significance.

Parvati relies for evidence of racial discrimination primarily on irregularities in the rezoning of the district in which the hotel is located. It presented no evidence of

racially tinged remarks or actions by the City's officials or indeed of any racial tensions in Oak Forest. It also presented no evidence that a retirement home catering to white people has ever been allowed in an M district (whether M, M-1, or M-2)—and so Parvati cannot, and it does not, invoke the method endorsed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), for establishing a prima facie case of racial discrimination.

But the irregularities in the zoning process relating to Parvati's efforts to convert its hotel to a retirement home were indeed numerous. They included, besides the quick retraction of the authorization for special-use permits for extended-stay hotels in M-2 districts, failing to indicate in the original amendment which former M districts were now M-1 and which M-2 (eventually this omission was repaired and the district in which the hotel is located was designated M-2); omitting from the amended ordinance "Appendix A," which was supposed to list the land uses permitted in M-1 and M-2 districts; and providing 13 days' notice of the public hearing on the proposed amendment that created the new districts rather than the 15 days that the City's zoning ordinance required. Nor was any explanation given for why the amendment was adopted when it was, which is to say shortly after Reverend Smith's appearance on the scene.

But Parvati presented no evidence that the irregularities were more numerous or serious than in other zoning proceedings in Oak Forest, which though called a City is really just a town, with fewer than 30,000 inhabitants,

and may have decided not to invest in sophisticated legal advice and drafting concerning zoning. Besides the irregularities and the timing of the amendment, no evidence of racial discrimination has been offered other than the listing agent's "impression" that City officials had been amenable to the proposed change in the use of the hotel building before they discovered it would be a retirement home for blacks.

Parvati points out that "a case of discrimination can . . . be made by assembling a number of pieces of evidence none meaningful in itself, consistent with the proposition of statistical theory that a number of observations each of which supports a proposition only weakly can, when taken as a whole, provide strong support if all point in the same direction: 'a number of weak proofs can add up to a strong proof.' *Mataya v. Kingston*, 371 F.3d 353, 358 (7th Cir. 2004*)." Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 903 (7th Cir. 2006). But the context in which the "weak proofs" of discrimination in this case are embedded tends to refute them.

It is easy to see why it would make sense to zone heavy and light manufacturing districts differently. Oak Forest's decision to do so is not unique. See *Atlantic Container, Inc. v. Township of Eagleswood Planning Board*, 728 A.2d 849, 856 (N.J. App. 1999); 1 Patricia E. Salkin, *American Law of Zoning* § 9:46 (5th ed. 2012). The amended ordinance (like the ordinance in the *Atlantic Container* case) sets higher limits for emissions of smoke, particulates, and odors in the heavy-industry (M-2) districts, and specifies larger lot-size and setback require-

ments in those districts. Light industry, which includes for example the production and distribution of food, may be as sensitive to smoke, particulate matter, and odors as residential or commercial establishments are, and so may need the protection conferred by excluding heavy industrial uses. A decision to separate the two types of activity is not an "obvious pretext" for discrimination, as Parvati argues.

It is even easier to see why a retirement home would be an inappropriate use in a heavy industrial district, and specifically in the M-2 district in which Parvati's former hotel is located. We were told at the oral argument without contradiction that there are no sidewalks in the district. There is significant truck traffic and there are industrial establishments cheek by jowl to the hotel. It is not a salubrious environment for old people, or indeed for residents of any age. And once there were long-term residents in the district, rather than transients, the City would face a demand for amenities such as sidewalks and street lights. Industrial tenants might be driven away by the increased risk of accidents and illness to the oldsters caused by the proximate industrial activities. There might even be suits for abatement of nuisances, consisting of the very activities, industrial in character, that the district is intended to host, brought by the owner or the residents of a retirement home if a retirement home were allowed in the district. For Illinois like most states rejects the doctrine of "coming to the nuisance." *Guth v. Tazewell County*, 698 F.3d 580, 584 (7th Cir. 2012) (Illinois law); *Oehler v. Levy*, 85 N.E. 271, 273 (Ill. 1908); *Woods v. Khan*, 420 N.E.2d 1028,

1030-31 (Ill. App. 1981). That is, it is no defense (corresponding to assumption of risk) to a suit to abate a nuisance that the plaintiff moved to the area knowing that the existing occupants had created a nuisance.

It is true that the population of Oak Forest is more than 90 percent white, and maybe some or even many of the white residents would like to preserve the City's existing racial composition. But there is no evidence of that; and the City's layout (the City is the irregularly shaped area in the middle of the Google map of Oak Forest below) suggests the improbability of a racial motive for the rezoning. The sliver of the City to the right (east) of Interstate 57 is the area in which the hotel is located. That it is indeed an industrial area, hardly likely to be a magnet for householders of any race, is shown in the aerial photo of the area, also below. (Both the aerial photo, and a detailed map of the area shown in the photo, can be viewed online at http://maps.google.com/?ll=41.5892,-87.7227&z=17 (visited Feb. 21, 2013).) Notice that the hotel, which is marked by the oval at the bottom of the photo, is sandwiched between the highway and the industrial establishments. Parvati has presented no evidence that any comparable facility, serving a white clientele, has ever been permitted by Oak Forest in a district comparable to the district in which the hotel is located.





And if the City wanted the industrial zone to be lily-white, it didn't have to amend the zoning ordinance. The existing ordinance limited nonindustrial uses in a manufacturing district to uses that are highway oriented,

which the hotel was as long as it was operated as a hotel, but would cease to be if it became a retirement home.

In sum, Parvati has failed to make a prima facie case of racial discrimination.

We can be brief concerning its other claim, that the zoning ordinance is unconstitutionally vague. It certainly was vague when, as a result of the omission of the appendix designating the M-1 and M-2 districts, Parvati didn't know which kind of district its hotel was in. But that omission was rectified, and there is no indication that Parvati was harmed by the glitch.

The main complaints about vague statutes or regulations are that they operate as traps for the unwary and that they induce careful people to steer far clear of the prohibitions, forgoing lawful activity because they can't be sure what uses of their property are lawful and what unlawful. Another concern is with the unlimited discretion that a vague statute or regulation may confer on the officials responsible for enforcing it. (See *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972), and *LC&S, Inc. v. Warren County Area Plan Commission*, 244 F.3d 601, 605 (7th Cir. 2001)—decisions that mention both concerns.) Vagueness in zoning can thus undermine property rights; property owners subject to an extremely vague zoning ordinance wouldn't know their rights because they wouldn't know what uses of their land were permitted. See *Baer v. City of Wauwatosa*, 716 F.2d 1117, 1124-25 (7th Cir. 1983). Parvati, however, is seeking damages not for delay in obtaining a definitive ruling on the con-

version of its hotel to a retirement home but for the difference between the building's value as a hotel and as a retirement home, and that difference is not claimed to be a result of the delays and irregularities in the zoning proceedings involving the property.

So Parvati must lose its appeal. But for completeness we note with disapproval the City's invocation of the "new business" rule as a bar to damages in this case even if liability could be shown. This discredited rule, see *MindGames, Inc. v. Western Publishing Co.*, 218 F.3d 652, 657 (7th Cir. 2000), precludes an award of damages for losses to a new business. The rule is based on the correct observation that it is more difficult to establish loss objectively when a business is strangled in its cradle, for then there is no history of profit and loss from which to extrapolate lost future profit—the profit the business would have earned had it not been killed or wounded by the defendant. But it doesn't make sense to build on this insight a flat prohibition against awarding damages in such a case; the general standard governing proof of damages, which requires a plaintiff to make a reasonable estimate of its damages as distinct from relying on hope and a guess, is adequate for cases in which a new business is snuffed out by a wrongdoer. *Id.* at 658; *TAS Distributing Co. v. Cummins Engine Co.*, 491 F.3d 625, 633 (7th Cir. 2007); *Ashland Management Inc. v. Janien*, 624 N.E. 2d 1007, 1012 (N.Y. 1993).

The City's invocation of the new-business rule is perverse, because this is not a new-business case. Parvati had a contract to sell the hotel to the church's affiliate

for $4.5 million, contingent on a change in zoning. Its damages would therefore be the difference between the value of the hotel as a hotel for transients, Parvati's "old" business—probably a slight value because Parvati's lender foreclosed on the hotel—and $4.5 million. The difference would be readily calculable, which would have enabled a confident estimate of Parvati's damages had it been able to prove that the sale fell through because of racial discrimination against the buyer's principal (the church).

AFFIRMED.