NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted March 15, 2013[*]
Decided March 19, 2013

**Before**

FRANK H. EASTERBROOK, *Chief Judge*

DANIEL A. MANION, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

No. 12-1493

| | |
|---|---|
| RODERICK FLOWERS, | Appeal from the United States District |
|     *Plaintiff-Appellant*, | Court for the Western District of |
| | Wisconsin. |
|     *v.* | |
| | No. 10-CV-00785 |
| NOBLE WRAY, et al., | |
|     *Defendants-Appellees*. | William M. Conley, |
| | *Chief Judge*. |

**O R D E R**

Roderick Flowers appeals the district court's grant of summary judgment to the City of Madison, Wisconsin, and three of its officials on claims that they wrongfully revoked his bar's liquor license. He contends that they applied an unconstitutionally vague standard for revocation, discriminated against him based on race, and denied him due process. We

---

[*] After examining the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* FED. R. APP. P. 34(a)(2)(C).

conclude that the revocation standard is adequate, no admissible evidence supports a race claim, and Flowers received due process. Accordingly summary judgment was proper.

Flowers, who is black, was the sole member of a limited liability company that owned R Place on Park, a bar in Madison. R Place opened in 2008 and served a mostly black clientele. Because its capacity was small (47 patrons), people often gathered out front and in the parking lot, and on occasion violent conflicts erupted. Flowers met with city officials in 2009 to address these disturbances. He requested a greater police presence at the R Place, but the officials replied that he bore the primary responsibility for managing the crowds there. The violence escalated in October 2010: A patron was stabbed in the wrist during a fight at the bar, and the next night shots were fired outside of it. In response to these back-to-back armed clashes, the city attorney who prosecutes cases before Madison's Alcohol License Review Committee, Jennifer Zilavy, immediately contacted Flowers. She asked him to close R Place at 11:00 pm rather than 2:00 am for the next two weeks, but Flowers refused, explaining that he did most of his business after 11:00. He again requested more police assistance in maintaining order.

Flowers's refusal to close early did not sit well with the City. Zilavy responded by imposing on R Place a "Chief of Police Security Plan" under § 38.07(13) of the Madison General Ordinances. Among other things, the plan required Flowers to hire two armed security guards and to procure uniforms for his employees. Zilavy described the plan in a letter to Flowers, which begins by criticizing him for refusing to close early and instead requesting additional assistance from police. "The City, more specifically the police department, can't run your business for you," she admonished him. The security plan also incorporated its conditions into an amended liquor license and explained that the new license was "effective immediately." Because Flowers had no warning of these changes, he needed to close R Place for a few days to arrange for compliance. Flowers appealed the imposition of the plan, but eventually he reached an agreement with the City and dropped the appeal.

In Zilavy's letter, she also informed Flowers that she would ask the City's liquor-license committee to revoke R Place's liquor license. Three days later, Police Captain Joseph Balles (one of the defendants here) filed a license-revocation complaint with the committee at Zilavy's behest, charging that R Place was a "disorderly house." *See* MGO § 38.10(1)(a). The committee held five days of hearings over the course of a year. Flowers's attorney presented evidence to oppose revocation, including several citizens who testified to the importance of R Place in their community. But the committee also learned that between May 2009 and March 2011, police officers had responded to at least 17 reports of violence at R Place—three involving gunshots and two involving knives—and that neighbors had lodged over 200 noise and parking complaints. After considering this evidence, the

committee voted seven-to-one to revoke, and its recommendation was accepted by Madison's Common Council.

In the midst of the revocation proceedings, Flowers sued the City and three of its officials under 42 U.S.C. § 1983. Flowers designated the limited liability company that owned R Place as plaintiff, but when the court allowed counsel for the LLC to withdraw from the case, the court substituted Flowers as the plaintiff, pro se, and extended the discovery schedule to reflect the change. After discovery closed, the defendants moved for summary judgment, and Flowers timely responded. About five weeks later, Flowers moved to amend the pretrial scheduling order to extend the time for discovery. He did not explain what evidence he hoped to collect or why he had waited to file the motion. The court granted summary judgment to the defendants the next day without explicitly discussing Flowers's motion.

On appeal Flowers develops four arguments that merit analysis. The first is that the district court should have granted his motion to allow more time for discovery. Motions to extend discovery deadlines in pretrial orders fall under Rule 16(b)(4), the disposition of which we review for abuse of discretion. *Alioto v. Town of Lisbon*, 651 F.3d 715, 720 (7th Cir. 2011). Flowers tells us that with additional time for discovery, he could have obtained evidence that the City of Madison targets bars frequented by black patrons and, consequently, few of these bars remain. He also stresses that during the months that the court took to decide the lawyer's motion to withdraw, the defendants prepared interrogatories and collected evidence, while he was uncertain whether R Place would be represented and, if not, whether he would be permitted to represent himself.

Although the district court did not explicitly discuss Flowers's motion to extend discovery, we can treat its grant of summary judgment to the defendants as a denial, *see Norman v. Apache Corp.*, 19 F.3d 1017, 1021 (5th Cir. 1994), and we conclude that this denial was proper. Flowers, who neither told the district court what discovery he sought nor explained why the previous extension was inadequate, did not demonstrate "good cause" to extend discovery, as required by Rule 16(b)(4). Although he tells *us* why he wanted more time for discovery, our task is to review whether, based on the reasons he gave the district court, that court abused its discretion. Since Flowers had already received an extension, waited more than a month after the deadline to ask for more time, and gave the court no specific reasons for his request, the court did not abuse its discretion. *See Brosted v. Unum Life Ins. Co. of America*, 421 F.3d 459, 464 (7th Cir. 2005).

Next, Flowers maintains that the term "disorderly house" in Madison's ordinance, *see* MGO § 38.10(1)(a), is unconstitutionally vague and invites arbitrary enforcement. In support he points to a report from the Ad Hoc Committee on Alcohol Licensing and Traffic

Stops of African Americans, a document that Madison's Equal Opportunities Commission prepared in 1997. The report criticized the ordinance's "disorderly house" provision because the City might enforce it in a racially discriminatory way.

A municipal law is unconstitutionally vague if it fails to make clear what is prohibited and lacks standards that guard against arbitrary enforcement. *Hegwood v. City of Eau Claire*, 676 F.3d 600, 603 (7th Cir. 2012). Although Madison's ordinance itself does not define "disorderly house," the City has published guidance on the term, explaining that "fights, . . . noise, batteries, . . . weapons violations, . . . or other disturbances" are indications of a disorderly house. *See* Enforcement of Alcohol Violations Against Licensed Establishments § 1(f), *available at* http://www.cityofmadison.com /clerk/documents/AlcoholViolationEnforcement-LongVerison.pdf (last accessed Mar. 4, 2013). Furthermore, in *Hedgwood* we upheld, against a similar challenge for vagueness, Wisconsin's nearly identical "disorderly house" standard for revoking liquor licenses. *Id.* at 604. Because R Place was the scene of violent clashes comparable to those that occurred at the bar in *Hedgwood*, Madison did not apply an unconstitutionally vague standard of "disorderly house" to R Place.

The third contention Flowers raises on appeal is an equal-protection challenge to the revocation of R Place's liquor license. He argues that the evidence he submitted, including the 1997 report, shows that the defendants targeted R Place because of its association with black patrons rather than because of its disorderliness. Bars in Madison facing the same disturbances as R Place—but catering to a mostly white crowd—have not had their liquor licenses revoked, he asserts.

For his equal-protection claim to survive summary judgment, Flowers needed either to present a direct case that race motivated the revocation of the liquor license or to employ the indirect method endorsed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Parvati Corp. v. City of Oak Forest*, No. 12-1954, slip op. at 5–6 (7th Cir. Mar. 1, 2013). Under the latter approach, to establish a prima facie case of race discrimination, Flowers needed to present evidence (1) that he or his bar's patrons, *see id.* at 5, belong to a protected class and (2) that a similarly situated bar frequented or owned by white people has been treated more favorably than R Place. *See Radentz v. Marion Cnty.*, 640 F.3d 754, 757 (7th Cir. 2011); *Brown v. Budz*, 398 F.3d 904, 916 (7th Cir. 2005). Flowers, however, neither presented admissible evidence to support a direct case of race discrimination nor established a prima facie case using the *McDonnell Douglas* method. He submitted newspaper articles that accuse the City of discriminating against black-owned and black-patronized bars, but newspaper articles offered for the truth of what they report are inadmissible hearsay. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). He also furnished police reports of violent incidents at various Madison bars, including one he focuses on called Wiggie's, but he has never offered

evidence that any one of these bars is white-owned or patronized, experienced similar levels of violence and complaints, and yet was treated more favorably than R Place. Because no reasonable fact-finder could have found on the district court's record that the plaintiff met his burden on this issue, summary judgment was appropriate. *Srail v. Village of Lisle, Ill.*, 588 F.3d 940, 945 (7th Cir. 2009).

Flowers' last appellate argument is that the defendants denied him due process by issuing—without first granting him notice or a hearing—the security plan that amended R Place's liquor license, effective immediately. Because Flowers was not notified of the new requirements before they went into effect, he was unprepared for them, he explains, and had to close the bar for a few days, resulting in revenue loss. He also points out that the Wisconsin Supreme Court recently held (on state-law grounds) that, when renewing a liquor license, a municipality may not change the description of the bar's premises without the licensee's consent. *See Wisconsin Dolls, LLC v. Town of Dell Prairie*, 815 N.W.2d 690, 698 (Wis. 2012). He derives from this case a property interest in his liquor license.

Even if under Wisconsin law Flowers had a property interest in the liquor license, he is incorrect that when Madison amended it he was deprived of property without due process. A post-deprivation remedy can satisfy due process when the deprivation results from "quick action" that the state had to take to solve an urgent problem. *Parratt v. Taylor*, 451 U.S. 527, 539 (1981); *see Belcher v. Norton*, 497 F.3d 742, 750 (7th Cir. 2007). Here, after Flowers refused to curtail late-hour operations, Madison imposed the security plan to respond to the ongoing, armed violence at R Place. Flowers could immediately appeal the imposition of the plan and argue that it was unjustified. He did so, but he eventually dropped the appeal when he and the City agreed to the plan's terms. The availability of this post-deprivation remedy satisfies due process.

AFFIRMED.