In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-1056

THOMAS SIMSTAD, *et al.*

*Plaintiffs-Appellants*,

*v.*

GERALD SCHEUB, *et al.*

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:07-CV-407-JVB-APR — **Joseph S. Van Bokkelen**, *Judge*.

ARGUED SEPTEMBER 25, 2015 — DECIDED MARCH 17, 2016

Before WOOD, *Chief Judge*, and BAUER and EASTERBROOK,
*Circuit Judges*.

WOOD, *Chief Judge*. Tom and Marla Simstad are longtime
developers in Lake County, Indiana. In late 2004, the Sim-
stads began the process of seeking approval from the Lake
County Plan Commission for a proposed subdivision project
called Deer Ridge South. In late 2006, the Commission ap-
proved the plans for the project. But this did not happen
quickly enough to satisfy the Simstads. They believed that

approval was delayed, at great cost to themselves, because of their support in 1996 for commission member Gerald Scheub's opponent in the County Commissioner primary race. They accordingly sued several members of the Commission and Lake County, alleging violations of the First and Fourteenth Amendments, the Racketeer Influenced and Corrupt Organizations Act (RICO), and various Indiana laws.

The case went to trial before a jury, but the district court eliminated some of the Simstads' claims during the trial. The remainder of their theories went to the jury, which found for the defendants. The Simstads have raised a number of points on appeal, but we conclude that the district court properly disposed of each aspect of the case and thus affirm its judgment.

**I**

The Lake County Plan Commission has nine members. Ind. Code § 36-7-4-208. A simple majority of five votes is necessary to approve a development plan. Ind. Code § 36-7-4-302. A number of steps precede final approval. First, a developer must obtain any permits required by state and federal agencies. Two months before a public Commission hearing, the developer files a "sketch plan" with the Commission and reviews that plan with the relevant state and federal agencies. Then the developer files a primary plat for Commission approval. The Commission staff (which does not include any Commission members) prepares comments on the plan for the Commission. At the public meeting, the developer presents the project, the staff comments on the plan, and the public may speak. The staff makes recommendations to Commission members on the project's compliance

with the relevant ordinances, but its views are nonbinding. Then the Commission takes an initial vote.

The Commission next evaluates the primary plat to determine whether it complies with the relevant subdivision control ordinance. The plat must identify standards for the size of individual lots, coordination between internal and external public ways, and coordination with municipal services. Ind. Code § 36-7-4-702. The Commission may waive requirements of the subdivision control ordinance, but it has no discretion to override the zoning ordinance. Ind. Code § 36-7-4-707.

Ken Bachorski was the lead developer for Deer Ridge South, to which we refer as the Project. He filed the first sketch plan on October 28, 2004. The Commission organized a meeting among Bachorski, a planner from the Commission's staff, and a highway department engineer to discuss that plan on November 17, 2004. The engineer indicated that the highway department wanted the Project to add acceleration and deceleration lanes on Clark Street, the main road bordering the subdivision. The planner told Bachorski to apply for a waiver of the requirement that all subdivision lots be rectangular. (The waiver was necessary because some of the proposed lots would border the subdivision's curved road.) Bachorski filed the first primary plat on November 30, 2004. In it, he requested two waivers: one to permit the irregular lot shapes, and one that would exempt him from widening Clark Street, which had recently been upgraded and did not seem to need further work.

Because of the highway engineer's concerns about a proposed internal road (129th Street) that would cross a wetland, Bachorski met again with the engineer, several plan-

ners, and the Commission's Executive Director, Ned Ko-
vachevich, on February 17, 2005. At that meeting, the group
discussed both the wetland and sewer services. Kovachevich
and the highway engineer suggested eliminating one of the
two entrances to the subdivision because of the wetland con-
cerns. That approach triggered the need for two more waiv-
ers: one from the ordinance's requirement of two entrances,
and the other from a part of the ordinance setting cul-de-sac
length.

Bachorski filed a second primary plat on April 1, 2005,
accompanied by all four waiver requests. Despite the fact
that outside agencies recommended approval, the staff did
not support most of the necessary changes: it endorsed the
irregular lot waiver, but it opposed the single-entry and cul-
de-sac waivers and took no position on the widening of
Clark Street. At the public meeting on May 18, 2005, numer-
ous members of the public spoke against the Project. The
Commission denied all four waivers and voted to defer the
plat for 30 days.

The Project team responded by restoring the 129th Street
entrance to the plat. But this was not enough. At an August
17, 2005 meeting, Kovachevich asked to review the declara-
tions of the Property Owners' Association regarding the
maintenance of the subdivision's private park. He also said
that an easement from the cul-de-sac to the adjoining prop-
erty was necessary before he could propose approval.
Bachorski filed the third plat on August 31, 2005, with two
entrances and no waiver requests. Kovachevich removed the
plat from the October meeting agenda because it did not
contain requests for waivers from the requirements to widen
and improve Clark Street.

At Bachorski's insistence, Kovachevich put the plat on the agenda for the November 16, 2005 public meeting. Once again, the Commission withheld its approval. Kovachevich sent the Project team a letter citing six reasons for denial, including failure to request a waiver for Clark Street. The Plan Commission ultimately approved the plat on October 24, 2006, almost exactly two years after the first sketch was filed. But by the time the Simstads were ready to build, the housing market had collapsed. Eventually they had to sell the Deer Ridge South property at a steep loss to avoid default.

That, in a nutshell, is what led to this litigation. If the Project had been approved promptly, the Simstads believe, they could have made money from it. They sued everyone who was responsible for the approval process, but at this point they are asserting claims only against Scheub, who was on the Plan Commission's Board, Executive Director Kovachevich, and Lake County. They argue principally that Scheub violated their First Amendment rights by retaliating against them for their support of his opponent (Wilbur Cox) in the 1996 County Commissioner primary race; the complaint also included claims under the Fourteenth Amendment and RICO, 18 U.S.C. §§ 1962, 1964. They also raised supplemental claims under the Indiana Tort Claims Act, Ind. Code § 34-13-3-8.

Eight years may sound like a long time to hold a grudge, but the Simstads believe that this is exactly what Scheub did. Their lawsuit also followed a slow track. They initially filed it in the district court on November 15, 2007; the defendants filed a timely answer. On April 9, 2008, the Simstads filed an amended complaint, along with a number of discovery requests. The defendants filed a motion to dismiss the amend-

ed complaint and requested that the court stay discovery. It did so pending resolution of the motion to dismiss.

There the case sat until September 30, 2010, when the district court addressed the defendants' motion to dismiss. It issued an order dismissing the RICO claims, but denying defendants' motion with respect to the First Amendment, Fourteenth Amendment, and state-law claims. At that point, defendants' answer to the amended complaint was due on October 14, 2010, according to Federal Rule of Civil Procedure 12(a)(4)(A). That date came and went with no new answer.

The district court returned to the subject of discovery on December 3, 2010, noting that no one was doing anything: the defendants had failed to answer the Simstads' discovery requests, and the Simstads had not followed up with a motion to compel. The district court set new discovery deadlines. Following the close of discovery on October 26, 2011, the parties agreed to a trial date a *year* out, on October 1, 2012. That date slipped away too. The Simstads moved to reopen discovery on November 9, 2012, but the district court denied the request, which it viewed as an attempt to "restart [the] litigation." On September 11, 2013, nearly a year later, the Simstads filed a Notice of Intent to Rely on Deemed Admissions based on the defendants' failure to respond to discovery requests and their failure to file an answer to the amended complaint. Defendants filed a motion for leave to file a belated answer and set aside the admissions. The district court granted the defendants' motion after full briefing.

At long last, in December 2014 the case went to trial. After the Simstads presented their case, the district court disposed of most of the case with judgments as a matter of law. It dismissed the First Amendment claim, finding that there

was insufficient evidence of a connection between the 1996 election and the approval process for the Project; it dismissed the state-law claim for failure to provide timely notice under the Indiana Tort Claims Act; and it tossed the individual-capacity claim against Kovachevich for lack of evidence. The Equal Protection claim went to the jury, which found for the defendants.

On appeal, the Simstads complain that the district court should not have allowed the defendants to file such a late answer to the amended complaint, nor should it have permitted them to withdraw their admissions. They also argue that the court erred by refusing to instruct the jury on cat's-paw liability and the class-of-one theory of Equal Protection. Finally, they attack the court's grant of judgment as a matter of law on their First Amendment claim, their individual-capacity claim against Kovachevich, and their state-law claims.

## II

### A

Before we reach any of these arguments, we must first consider a potential bar to this entire lawsuit. Indiana's courts have already considered the ramifications of the Commission's refusal to approve the Project. The state trial court ordered mediation, and the parties reached a settlement, which provided that the Commission would approve a revised sketch plan for the Project at its regular meeting on August 16, 2006, or earlier. The Simstads filed a motion in Jasper County Circuit Court to enforce the settlement agreement on August 21, 2006, because the Project at that point had not yet been approved. On September 25, the state

court ordered enforcement and required the Commission to pay all the mediation fees. But the court refused to impose sanctions. The Simstads appealed the latter ruling, and the Commission cross-appealed from the decision that it had acted in bad faith in failing to approve the Project in August. Ultimately, the Indiana Supreme Court found that the Commission was not immune from sanctions, but that it had not acted in bad faith because the settlement agreement could not bind the Commission to approve the Project in violation of Indiana's Open Door Laws, which give the public the right of final approval. *Lake Cnty. Trust Co. v. Advisory Plan Comm'n of Lake Cnty.*, 904 N.E.2d 1274, 1278, 1279 (Ind. 2009).

When the case reached the federal court, the defendants raised the defense of claim preclusion in their motion to dismiss the first amended complaint. At that stage, the district court decided to postpone any definitive ruling on the defense, for several reasons. It was not sure whether the necessary identity of the parties existed; it was not sure from the record before it what issues had been raised and resolved in the state action; and it was not sure whether the plaintiffs had a full and fair opportunity to litigate the issues in that state court proceeding. These concerns suggest that the court had not decided whether claim or issue preclusion was implicated. Identity of parties is required for both, but actual litigation of particular issues is necessary only for issue preclusion. See, *e.g., Miller Brewing Co. v. Indiana Dep't of State Revenue*, 903 N.E.2d 64, 68 (Ind. 2009) (issue preclusion); *Reed v. State*, 856 N.E.2d 1189, 1194 (Ind. 2006) (claim preclusion). But the difference in these doctrines does not matter for present purposes, for a simple reason: the defendants never renewed their motion on *any* theory of preclusion. Had they

done so, we might have been able to end our opinion here. But under the circumstances, they have waived their preclusion defense, see *Kratville v. Runyon*, 90 F.3d 195, 198 (7th Cir. 1996), and we must press on.

B

We begin with the Simstads' procedural arguments. They urge that the district court erred by permitting the defendants to file an untimely answer and to be relieved of certain deemed admissions they made. On the one hand, these missteps are inexplicable: the defendants were represented by as many as five lawyers at any time, and it seems that at least *someone* would have known to take action. On the other hand, we review this type of ruling only for abuse of discretion. See *Lock Realty Corp. IX v. U.S. Health, LP*, 707 F.3d 764, 772 (7th Cir. 2013); *Banos v. City of Chicago*, 398 F.3d 889, 892 (7th Cir. 2005). From that standpoint, the district court may well have thought that there was blame enough to go around in the way this suit was being handled, and that it was best to clear the way for adjudication on the merits.

With respect to the late answer, the Simstads push back against the abuse-of-discretion standard by arguing that oversight is, as a matter of law, insufficient to excuse the late filing. They point to Federal Rule of Civil Procedure 6(b)(1)(B), which generally governs extensions of time when permission is not sought until after the expiration of a deadline, and adopts the "excusable neglect" standard. We do not find so much rigidity in the rule. The district court offered several reasons in support of its decision. It noted that it had not ruled on the defendants' motion to dismiss for approximately two and a half years, and that when it did, the ruling was "sort of a split decision" that meant that an answer to

the amended complaint was required even though time had passed. During the hiatus, the defendants' team of attorneys had changed. The court also observed that the Simstads had not notified the defendants that they intended to pursue default admissions based on the failure to answer.

We accept that a party must show that its neglect is excusable. *Cf. United States v. Marbley*, 81 F.3d 51, 52 (7th Cir. 1996) ("inadvertence" in the context of Federal Rule of Appellate Procedure 4(b) is simply a synonym of "neglect," and a party must demonstrate more to show *excusable* neglect). The Simstads contend that the defendants' "oversight" is nothing more than the "inadvertence" that *Marbley* found inadequate. But as we have just noted, the court found more than simple inadvertence. See *Mommaerts v. Hartford Life & Accident Ins. Co.*, 472 F.3d 967, 968 (7th Cir. 2007) ("[e]xtensions may be granted, after the time for action has passed … '[in] situations in which the failure to comply with a filing deadline is attributable to negligence' if the oversight is excusable") (quoting *Pioneer Investment Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 394 (1993)). The district court's decision whether to allow a late filing is "at bottom an equitable one, taking account of all relevant circumstances … includ[ing] … the danger of prejudice … the length of the delay … the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Pioneer Investment Servs. Co.*, 507 U.S. at 395.

The court addressed any potential prejudice to the Simstads by reopening discovery only for them. The Simstads moved for reconsideration, arguing that because one Commission member had since died, the reopening of discovery

did not cure their prejudice. The district court, however, found that this was not reason enough to exempt the Simstads from litigation on the merits. It was plain from the record that the Simstads had ample notice of the defendants' position. The district court did not abuse its discretion in allowing a belated answer to the amended complaint.

For similar reasons, we find no abuse of discretion in the district court's decision to permit the defendants to withdraw their deemed admissions. Federal Rule of Civil Procedure 36(b) allows a court to permit withdrawal of deemed admissions "if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party." That is the language of discretion. Any prejudice—and we do not think the Simstads have demonstrated any—was mitigated by the reopening of discovery for them alone. The inability to rely on default admissions and the obligation to litigate a case on the merits were not prejudicial here, nor did they reflect an abuse of discretion.

## C

The district court granted judgment as a matter of law on several aspects of the case: the Simstads' First Amendment theory; their individual-capacity suit against Kovachevich; and their state-law claims. Judgment as a matter of law is appropriate where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a). We review the district court's grant of judgment as a matter of law *de novo*. *Murray v. Chicago Transit Auth.*, 252 F.3d 880, 886 (7th Cir. 2001).

1

We consider first the Simstads' argument that the real reason why approval of the Project was delayed was retaliation for their political support of Gerald Scheub's opponent in the 1996 County Commissioner election. In order to prevail on a First Amendment theory, the plaintiffs must show that their conduct (1) was constitutionally protected and (2) was a substantial or motivating factor in the defendant's challenged actions. *Roger Whitmore's Auto. Servs. v. Lake Cnty.*, 424 F.3d 659, 668 (7th Cir. 2005). The parties agree that the conduct—supporting Scheub's opponent in the County Commissioner race—was protected. *Cf. O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712 (1996) (state may not refuse to contract with a party because of his exercise of First Amendment rights). The question for us is whether any jury could find that the Simstads' exercise of their First Amendment rights during the 1996 race had anything to do with the Project.

The district court concluded that the answer was no. Even accepting the general idea that the passage of time alone does not defeat a claim, it is certainly relevant. The Simstads rely on our decision in *Radentz v. Marion Cnty.*, 640 F.3d 754 (7th Cir. 2011), which held that an 18-month period between the time when the defendants made comments expressing a desire to hire an African-American and their termination of a contract with the white plaintiffs did not defeat an Equal Protection claim. *Id.* at 759. The length of time here, however, is 9 years! Without powerful evidence that the alleged grudge lasted that long, no jury could base its decision on that fact.

And there is, for all intents and purposes, no other evidence, powerful or otherwise. The only shred we can find is Tom Simstad's testimony that Wilbur Cox had told him that Scheub is a political animal who would get back at him. This statement obviously could not be used for the truth of the matter asserted; at most it would shed light on the effect it had on Tom. But without the ability to use the Cox statement for its truth, there is no evidence that Scheub even knew of the Simstads, let alone that he had any desire to retaliate against them.

The Simstads insist that Commission approval is a "ministerial" act and that therefore the fact that it voted against the Project once it complied with all ordinances is competent evidence of improper motive. But whether a proposal meets ordinances is not as cut-and-dried as the Simstads suggest. Rather, the determination of whether their project or any other meets the ordinances, with or without waivers, involves some degree of discretion.

2

The Simstads next contend that they should have reached the jury on their claim that Kovachevich personally violated their right to Equal Protection by influencing the Commission's vote in some way. This claim is woefully underdeveloped in the Simstads' briefs in this court; they do not even identify the basis or legal standard for an equal protection claim. But even if they have narrowly avoided waiver, they cannot prevail. As the Executive Director of the Commission, Kovachevich did not have a vote. Several voting members testified that they did not rely exclusively on staff comments, and Kovachevich was not the sole author of the staff comments on the Project. Furthermore, the Simstads have almost

no evidence of animus on his part. They point only to one heated exchange that took place between them in 1996, related to an earlier project.

Problems of causation aside, the Simstads' Equal Protection claim also stumbles on the standard of review. They do not assert that they were disadvantaged because of any suspect classification. That means that Kovachevich's actions must be examined solely for a rational basis. From that standpoint, it is easy to find reasons why the Project was delayed: the concern about wetlands, the debate about the number of entrances to the subdivision, and the adequacy of Clark Street, to name a few. Add to these Kovachevich's limited power to influence the final decision, and only one conclusion is possible: he was entitled to judgment as a matter of law for the Equal Protection claims against him in his individual capacity.

3

The district court dismissed the Simstads' state-law claim for tortious interference with business relationships for failure to file timely notice in accordance with the Indiana Tort Claims Act. That Act requires a person with a claim against a governmental entity to file notice within 180 days of when the events giving rise to the claim occur. Ind. Code § 34-13-3-8. The Simstads contend that the defendants forfeited this defense by stating that they were ready to go to trial on the claims that survived the motion to dismiss. But the defendants had raised the notice defense in both their original answer and their answer to the amended complaint. That was enough. In fact, if anyone was guilty of forfeiture, it is the Simstads, who said nothing about this point until their briefs on appeal.

The Simstads filed their notice-of-claim with the state on February 16, 2007. The district court found that this was too late, on the assumption that the clock began to run in November 2005, when the Commission first denied approval of the Project. The Simstads now argue that the clock did not begin to run until the Commission's ultimate approval vote in October 2006. If that is correct, then their notice was timely. But it would be perverse to look to the date when they succeeded in obtaining approval, and ignore the date when they failed. And their own actions support this view. They considered the November 2005 denial sufficiently final to appeal in state court.

The Simstads argue in the alternative that they can reach the October 2006 trigger date by virtue of the "continuing wrong" doctrine. But it does not apply here. The continuing wrong doctrine requires that "the plaintiff … demonstrate that the alleged injury-producing conduct was of a continuous nature." *Gradus-Pizlo v. Acton*, 964 N.E.2d 865, 871 (Ind. Ct. App. 2012). The doctrine "will not prevent the statute of limitations from beginning to run when the plaintiff learns of facts which should lead to the discovery of his cause of action even if his relationship with the tortfeasor continues beyond that point." *Fox v. Rice*, 936 N.E.2d 316, 322 (Ind. Ct. App. 2010).

As the district court correctly recognized, the time provided by state law began to run in November 2005. The Simstads were thus barred from asserting their state-law claims for failure to file timely notice.

D

Last, the Simstads urge that they are entitled to a new trial because of two alleged errors in the instructions to the jury: first, the absence of an instruction on cat's paw liability, and second, the absence of an instruction on a "class-of-one" Equal Protection violation. In order to obtain a new trial on this basis, an appellant must demonstrate that the given instructions failed to state the law properly, the jury was likely to be misled or confused, and prejudice resulted.

The Simstads wanted the jury to consider whether the improperly motivated conduct of subordinate employees of the Plan Commission caused the voting members of the board to vote as they did. This theory is known as "cat's paw" liability. *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011). The Simstads wished to impute Kovachevich's or Scheub's alleged animus to the rest of the Commission, which they believe was swayed by Kovachevich's recommendations against approval prior to October 2006.

It is not clear how, or whether, this type of imputed motive applies in the municipal liability context. *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690-91 (1978), prohibits finding municipal liability through the theory of *respondeat superior*. We have wondered whether the cat's-paw theory can support entity liability under the civil rights laws when the entity is a municipal corporation and the biased or retaliatory subordinate is not a policy-maker. *Smith v. Bray*, 681 F.3d 888, 899 (7th Cir. 2012); *Waters v. City of Chicago*, 580 F.3d 575, 586 n.2 (7th Cir. 2009). This is not the case, however, in which we need to confront that issue. As our discussion thus far shows, there is insufficient evidence of animus or improper motive held by anyone involved to warrant a jury

instruction on the theory. The Simstads suggest that the fact that it took the Commission two years to approve the project is somehow evidence of improper motive or animus, but we cannot accept that circular reasoning.

The Simstads' request for a class-of-one instruction fares no better. Such a claim exists where "a public official, 'with no conceivable basis for his action other than spite or some other improper motive … comes down hard on a hapless private citizen.'" *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013) (quoting *Lauth v. McCollum*, 424 F.3d 631, 633 (7th Cir. 2005)). A class-of-one plaintiff must "negat[e] any reasonably conceivable state of facts that could provide a rational basis for the classification." *Miller v. City of Monona*, 784 F.3d 1113, 1121 (7th Cir. 2015) (quoting *Scherr v. City of Chicago*, 757 F.3d 593, 598 (7th Cir. 2014)).

The Simstads' evidence fell far short of that showing, and so the district court properly refused to instruct the jury on this theory.

### III

We are distressed that it took this case so long to be resolved. Some of the problems might have been avoided with better control over the schedule, and some might have been resolved in a way that did not prompt an appeal. But in the final analysis, we find no error in the district court's procedural rulings or its Rule 50 decisions. We therefore AFFIRM its judgment.